# "EXHIBIT 8"

# STATEMENT OF

# POLICE OFFICER III NICHOLAS KNOLLS

Senior Administrative Clerk V. Shaw, Serial No. N4488, reviewed the digital recording (TP97313, F004-22) and transcription of Officer Knolls' interview.  The inaudible recordings that were clearly audible are listed below.  All others remain inaudible.

| PAGE | LINE | INAUDIBLE/CORRECTIONS |
|------|------|------------------------|
| 03 | 12 | REPLACE: is WITH: **has been** |
| 03 | 22 | ADD: **any** subsequent |
| 05 | 12 | DELETE: in |
| 09 | 20 | REPLACE: Marco WITH: **Marcos** |
| 09 | 21 | REPLACE: Griffen WITH: **Griffin (*throughout*)** |
| 10 | 08 | REPLACE: out WITH: **up** |
| 11 | 23 | REPLACE: I mean WITH: **And** |
| 16 | 19 | REPLACE: possy WITH: **posse** |
| 17 | 23 | REPLACE: had WITH: **the** |
| 23 | 19 | ADD: **of** the |
| 24 | 17 | ADD: **the** suspect |
| 25 | 14 | ADD: **on**, on the |
| 25 | 22 | ADD: **if** the suspect |
| 28 | 06 | DELETE: **he** |
| 28 | 20 | REPLACE: I WITH: **that** |
| 29 | 02 | REPLACE: Alferez's WITH:  **Olivares'** |
| 29 | 07 | REPLACE: for WITH: **from** |
| 29 | 09 | REPLACE: residents WITH: **residence** |
| 29 | 13 | REPLACE: Alferez WITH:  **Olivares** |
| 30 | 06 | REPLACE: and WITH: **in** |
| 31 | 17 | REPLACE: down WITH: **on** |
| 36 | 02/06 | REPLACE: rouse WITH: **ruse** |
| 36 | 24 | DELETE: **you** |
| 43 | 24 | DELETE: **or** |
| 49 | 03 | ADD: **that** was involved |
| 49 | 11 | REPLACE: your WITH: **you were** |
| 51 | 14 | ADD: **do you** independently |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER      LADA 0797**

LOS ANGELES POLICE DEPARTMENT

```
In the Matter of:                    )
Officer Involved Shooting            ) FID No. F004-22
Transcription of Taped               ) DR No. 2216-05080
Interview Of Police Officer III      ) Job File Name
Nicholas Knolls, #38452              ) Police Officer III
_____      ) Nicholas Knolls
```

## TRANSCRIPTION OF TAPE RECORDED INTERVIEW

## OF POLICE OFFICER III NICHOLAS KNOLLS

```
Transcribed by:
Nanette Jensen
CSR No. 9066

Job Number:
TP97313
```

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER      LADA 0798**

```
1                  Los Angeles Police Department

2              F004-22 Police Officer III Nicholas Knolls

3

4         DETECTIVE JOHNSON:  Today's date is the 8th of

5    February 2022.  The time is now 2143 hours.  I'm

6    Detective II Douglas Johnson, J-o-h-n-s-o-n, my serial

7    number is 37738.  I am assigned to Force Investigation

8    Division.  And I'm here at Foothill station to interview

9    Police Officer III -- sir, would you please state and

10   spell your first and last name into the record?

11        NICHOLAS KNOLLS:  Nicholas Knolls.  Nicholas,

12   N-i-c-h-o-l-a-s, Knolls, K-n-o-l-l-s.

13        DETECTIVE JOHNSON:  Serial number, sir?

14        NICHOLAS KNOLLS:  38452.

15        DETECTIVE JOHNSON:  This is regarding an officer-

16   involved shooting incident that occurred at or near

17   12935 Desmond Street, D-e-s-m-o-n-d, on or about the 1st

18   of February 2022.

19        This interview is being digitally recorded.  Also

20   present --

21        DETECTIVE ILLIG:  Detective Timo Illig, T-i-m-o,

22   I-l-i-g, 36893, Force Investigation Division.

23        POLICE OFFICER DELEON:  Police Officer III Julio

24   Deleon, D-e-l-e-o-n, serial number 39040 from Officer

25   Rep Section.
```

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0799

1    point my partner and I responded Code 3 to the address

2    on Desmond.

3        Once we got to the address on Desmond, I saw

4    Sergeant Alferez at scene.  I immediately advised -- or

5    Sergeant Alferez asked for a shield and I told him we

6    had a shield in the back of the shop.

7        So I advised Sabrina to grab the shield from the

8    back of the shop.  At which point Sergeant Alferez told

9    me to -- or told us to get a black and white in the

10   driveway so that we had a black and white for the PA

11   announcements into the house to talk -- or to

12   communicate with the suspect inside the house.

13       Um, I then positioned my shop in the -- in the

14   driveway of the residence.  Um, at that point

15   Sergeant Alferez told me that he was incident commander

16   and told me to put together a contact arrest team while

17   we were at scene.

18       From that point with the resources there, I started

19   designating officers with assignments.  Um, I had Leo

20   Martinez as my initial lethal officer.  I had Marco

21   Gutierrez as my beanbag, and then I had officers Griffen

22   and Lopez from the Gang Unit as my arrest team.

23       And I had my -- had Sabrina be the contact person on

24   the PA initially.

25       Um, once I had the assignments divvied up, I advised

9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER      LADA 0806

1    sarge that we had an arrest team ready to go.  Um, at

2    which point he had me have Sabrina start talking to the

3    subject inside the residence.

4        Obviously he was pretty erratic inside the

5    residence.  He was going back and forth between the two

6    windows in the front bedroom.

7        So I advised her to starting talk to him, giving him

8    commands to come out with his hands out, follow the

9    direction of the officers.  Um, just trying to find

10   something to talk to him about to get him to come out.

11       At which point probably about 10 minutes or 15

12   minutes I think Sergeant Alferez advised me to have

13   somebody else start talking to him because he wanted

14   someone with a little more experience talking to him and

15   a little more authority in their voice.

16       So I told Officer Lopez to, um, get in the driver's

17   seat and start talking to him on the PA.  Um, and then

18   as officers were still responding, I had -- I was still

19   positioning other officers.  I had Officer Frazer come

20   up as a cover officer for the officers that were

21   speaking on the PA system on the driver's side of the

22   vehicle.

23       And then we continued to keep talking him out.  Um,

24   giving him commands to come out and surrender

25   peacefully.

10

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0807

1     During that time Sergeant Alferez walked up and used

2     the PA system and advised him, you know, if he came out

3     with a weapon that force would be used.

4         Um, that force could cause serious bodily injury or

5     death depending on what transpired.  And then from there

6     we were setting up our containment, um, we had officers

7     on the two, three, four side.  We had officers in the

8     front.

9         At which point Sergeant Alferez advised everyone to

10    helmet up, make sure we had our helmets.  And then while

11    we were doing that, we were still communicating trying

12    to get the suspect to come out of the house.

13        We -- you know, he kept going from the front to the

14    back of the residence into the front bedroom and then to

15    the other adjacent bedroom on the two side of the house.

16    You know, he was very erratic, yelling different

17    things from the windows.  We were trying to get anything

18    to try to talk to him about, trying to get him to come

19    out of the house.

20        At one point I told Sabrina, um, to go ask the

21    family if the main house was connected to the garage

22    because I could see that there was a carport with a

23    garage door.  I mean, it looked as if it was closed off

24    but I wasn't certain.

25        So I sent her to go talk to the family.  Um, she

11

1    came back shortly thereafter and advised me that there

2    was a female inside the garage.

3         We were under the impression that everybody was out

4    of the house.  Um, I advised Sergeant Alferez that we

5    had a female living in the garage.  At which point

6    Sergeant Alferez told me to get a team together to go

7    remove the female from the garage so that the suspect

8    didn't have access to her or didn't take any hostages or

9    anything like that.

10        So I -- I called over Officer Kiker, Officer Barba

11   and Officer Carlos.  And that was my team that I took

12   into the back yard to go retrieve the female from the

13   garage.

14        I designated Officer Kiker as my lethal with a

15   shotgun.  And Officer Barba with the shield and I had

16   Officer Carlos with less lethal.

17        Officer Barba advised us that he had been in the

18   back yard and knew that the two side was very narrow.

19   So we knew that it was going to be single file as we

20   approached the back yard from the two side.

21        Um, at which point Sergeant Alferez gave us the go

22   to get the female from the garage and we made a decision

23   to walk in front of the two cars that were parked in the

24   driveway.  There was a black compact car and either a

25   truck or SUV in front of that.  So we used that as cover

                                                          12

1    as we passed by the windows.

2        Um, I know at that point I did unholster my firearm

3    based on the tactical situation that this guy was inside

4    the house armed with knives, um, based on his erratic

5    behavior going from room to room.  I was providing cover

6    as I was clearing the windows.

7        Um, as I got to the one, two corner and came to the

8    window that was in that corner, the suspect opened the

9    door and started to approach that bedroom.  At which

10   point I had my firearm at the low ready.  And my team

11   was proceeding to the back.  So I continued to walk with

12   him since he didn't charge the window or anything like

13   that.

14       So we made our way along the two side back to the

15   back yard on the three side.

16       We passed an enclosed laundry room that didn't

17   appear to be attached to the house.  There was no access

18   from inside the house as it appeared as we were clearing

19   it.  And then we got to the three side and saw a sun

20   room with multiple windows that looked like some sort of

21   family room, TV room.  And as we got to the back yard we

22   saw a detached separate structure in the three, four

23   corner of the yard.

24       And then Officer Kiker identified the door from the

25   sun room and held that position with the shotgun.

13

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0810

1    room.

2        And then in the northwest corner of the yard there

3    was a -- you would call it a 10 by 10 bungalow.  It was

4    a separate structure not attached to the house.  It had

5    a door which Officer Carlos knocked at and that's where

6    we came in contact with the male in the back yard.

7        So then the sun room, probably extended I don't know

8    about 10 or 15 feet from the house into the yard.  And

9    there was a door from that sun room into the back yard.

10   And then the garage ran the width of the house to the

11   west where there was a black wrought iron gate that

12   Officer Barba and I entered and there was an exterior

13   door to the garage on the -- on the east side of the

14   property where we contacted the female that was inside

15   the garage.

16       DETECTIVE JOHNSON:  In the driveway area I believe

17   that you made mention of some vehicles.  Can you just

18   describe the vehicles that you saw in the driveway area

19   the residence?

20       NICHOLAS KNOLLS:  So I believe there was a -- well,

21   if you're looking directly at the house which I was,

22   there was to the left of the carport in front of the two

23   bedroom windows there was a black compact car and then I

24   believe it was white like some kind of small pickup or

25   SUV parked in front of that.

                                                          23

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0820

1     DETECTIVE JOHNSON:  Okay.  You indicated that you

2   positioned your police vehicle, um, in the driveway

3   area.

4     Can you just specifically describe how the police

5   vehicle was positioned?

6     NICHOLAS KNOLLS:  So I had the -- the police vehicle

7   facing north in the driveway.  Um, I pulled it up as far

8   as I could to -- there was a brick retaining wall with a

9   sliding wrought iron gate, um, closing off the driveway

10   to the residence.

11     I had one of the officers, I believe it was

12   Officer Kiker open the wrought iron gate all the way.  I

13   positioned the black and white pretty much even with

14   the brick wall closing off that path.

15     So basically I left the passenger side of the

16   vehicle.  I left an access for officers if we had to

17   contact suspect if he came out.

18     So there was probably about five feet of brick wall

19   on the passenger side of the vehicle.  And then in

20   between the vehicle and that brick wall there was

21   probably about six to nine feet between the vehicle and

22   the brick wall.

23     DETECTIVE JOHNSON:  The way you're describing the

24   positioning of the shop makes it sound intentional.  Was

25   that done intentionally?

24

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**   **LADA 0821**

1          NICHOLAS KNOLLS:  I, mean I put it up there so that
2     I -- obviously I wanted it close enough so that the PA
3     was heard.  And then also I wanted to give the officers
4     up at scene cover so that everybody had cover behind the
5     vehicle.
6          Obviously we needed someone inside to talk on the
7     PA.  So we wanted them to have cover.  We had cover
8     officers covering while they were talking on the PA.
9     And they had officers on the other side part of the
10    contact arrest team that were designated if the suspect
11    came out of the house.
12         DETECTIVE JOHNSON:  Okay.  And in watching the body-
13    worn video it looks like some of the lights were turned
14    on the police vehicle.  Did you do that?
15         NICHOLAS KNOLLS:  I believe I did, yes.
16         DETECTIVE JOHNSON:  Can you just tell me which
17    lights were turned on?
18         NICHOLAS KNOLLS:  So I turned the spotlight on the
19    passenger side of the vehicle towards the front door.
20    So basically it was shining underneath the carport
21    towards the black wrought iron gate so that we could see
22    the suspect came out of the residence.
23         And then I positioned the driver's side spot light
24    on the bedroom window where we were having the most
25    contact with the suspect.

25

1     DETECTIVE JOHNSON:  Okay.  Um, and what was the

2     purpose of positioning those lights in that manner?

3     NICHOLAS KNOLLS:  Just to illuminate the house so

4     that we had a clear visual of the suspect if he came

5     out.  Because underneath the carport there wasn't any

6     lighting or didn't appear to be any lighting.  It was

7     pretty dark once you got back towards, um, the front

8     door of the residence because it was set back pretty

9     far.

10    DETECTIVE JOHNSON:  Okay.  Um, you spoke about

11    assembling an initial arrest team and you made mention

12    of specific jobs.

13    Were there -- the one thing I wanted to clarify,

14    were there any assignments for people with less lethal

15    weapons on that arrest team?

16    NICHOLAS KNOLLS:  Yes, I had Officer Marcos

17    Gutierrez designated as the beanbag officer.

18    DETECTIVE JOHNSON:  Okay.  And I believe that you

19    indicated that you also in addition to assembling that

20    arrest team specifically positioned Officer Frazer and

21    that's spelled, F-r-a-z-e-r.  Where was he positioned?

22    NICHOLAS KNOLLS:  Once Officer Frazer arrived at

23    scene I had him deploy his shotgun as a cover officer on

24    the driver side of the vehicle to cover the bedroom

25    window that he was -- the suspect was coming back and

26

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0823

1    forth from.

2        My -- my purpose was that if -- based on his erratic

3    behavior was if he did -- the window was open big enough

4    that my thought process was that if he jumped out the

5    window and ran towards officers, that my contact -- or

6    my communications officer had cover and that's why I put

7    Frazer there.

8        DETECTIVE JOHNSON:  And the communications officers

9    is that the person that was on the PA?

10       NICHOLAS KNOLLS:  Yes.

11       DETECTIVE JOHNSON:  Okay.  Can you give me a list of

12   people that you recall speaking on the PA and if you

13   could give it in order of the first person to last

14   person that you remember?

15       NICHOLAS KNOLLS:  So the first person I designated

16   to talk on the PA was Sabrina Martinez.

17       The next person was Officer Lopez.  I believe after

18   Officer Lopez, Sergeant Alferez approached the passenger

19   side of the vehicle and gave the suspect a warning

20   saying that, you know, if he came out of the house armed

21   that a use of force or less lethal could be used that

22   could cause serious bodily injury or death.

23       And then once Sergeant Alferez gave that

24   announcement, um, Officer Lopez continued talking.  And

25   then I had Leo Martinez try and talk to the suspect and

                                                        27

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0824

1   that was probably for the majority of the time.

2       And then once Martinez -- or Leo was done, I

3   attempted to talk to him on the PA.

4       DETECTIVE JOHNSON:  Okay.  And did anybody speak on

5   the PA after you that you're aware of?

6       NICHOLAS KNOLLS:  Not that I am he aware of.

7       DETECTIVE JOHNSON:  Okay.  Then just for the

8   transcriber some names that have come up already

9   Sergeant Alferez is A-l-f-e-r-e-z, and Officer Kiker is

10   K-i-k-e-r.

11       You indicated that officers had been positioned to

12   contain the residence.  Can you just describe to me as

13   much detail as you recall the containment plan for the

14   residents?

15       NICHOLAS KNOLLS:  So once I arrived at scene, um,

16   Sergeant Alferez had already advised me that he had a

17   unit in the adjacent yard to the east.  He had four

18   officers in the yard north of the property and then we

19   had four officers out on the sidewalk behind the brick

20   wall on the southwest corner of the property I had a

21   visual of the wrought iron gate that the suspect

22   eventually came out of.

23       DETECTIVE JOHNSON:  Okay.  And just from where you

24   were positioned with the officers near your police car

25   could you see any of the containment officers?

28

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0825**

1    certain.  I wasn't paying attention to the clothing at

2    that time.

3         DETECTIVE JOHNSON:  Did you see any injuries?

4         NICHOLAS KNOLLS:  To him?

5         DETECTIVE JOHNSON:  Yeah.

6         NICHOLAS KNOLLS:  And we're talking about as we're

7    going to the back yard, correct?

8         DETECTIVE JOHNSON:  Yes, sir.

9         NICHOLAS KNOLLS:  Not that I could see.

10        DETECTIVE JOHNSON:  Okay.  Did you see him armed

11   with any weapons at that point?

12        NICHOLAS KNOLLS:  No, I did not because my team was

13   already moving to the north side of the property.  And

14   like I said, he came into that room briefly.  He didn't

15   charge the window or anything at that point, so I

16   continued with my team.  I didn't engage him or talk to

17   him.

18        DETECTIVE JOHNSON:  So throughout the incident it

19   appears that there was numerous attempts made to

20   establish dialogue with the suspect.  Do you remember

21   what if anything he said to you or the other officers?

22        NICHOLAS KNOLLS:  Um, I know at one point, um, it

23   appeared that he was angry at -- I don't know if it was

24   his uncle or step dad.

25        Um, and he asked to talk to the step dad.  Um, and

34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0831

1    then he was very erratic.  There was some Spanish

2    spoken.  Obviously I don't speak Spanish.  I don't -- I

3    mean, I understood the word "rata" would be a rat.

4         Um, other tan that I don't really -- I didn't know

5    what he was saying in Spanish.  I tried asking some of

6    the Spanish officers.  Even they were saying it was

7    very -- it wasn't clear as to what he was saying in

8    Spanish.

9         Um, and then at some point as we were trying to

10   communicate with him, he started yelling out "white

11   power," um -- saying that -- that the Latinos needed to

12   fight back against the white power.

13        Nothing was real clear as to what he was saying.  It

14   sounded very erratic, very sporadic as far as what he

15   was saying.

16        DETECTIVE JOHNSON:  Okay.  Did he make any threats

17   to you or the other officers?

18        NICHOLAS KNOLLS:  Not that I'm aware of or heard.

19        DETECTIVE JOHNSON:  Okay.  Um, at one point it

20   sounded like somebody said over the public address

21   system that the SWAT team was en route.  Can you expand

22   on that?

23        NICHOLAS KNOLLS:  So I think at that point we were

24   probably -- God, probably about 40, 45 minutes into

25   this.

                                                              35

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0832

1       At that point I think we -- Officer Martinez threw

2   out the rouse that the SWAT team was coming, um, that if

3   they did come that they were going to, you know, gas the

4   house and get him to come out.

5       DETECTIVE JOHNSON:  Okay.  So to your knowledge that

6   was a rouse?

7       NICHOLAS KNOLLS:  At that point, yes, because

8   obviously they weren't at scene yet.

9       DETECTIVE JOHNSON:  Okay.  What was your

10  understanding about SWAT as it relates to this incident?

11      NICHOLAS KNOLLS:  That SWAT would respond once it

12  was deemed a barricaded suspect.

13      DETECTIVE JOHNSON:  Okay.  Um, can you expand on

14  that?

15      NICHOLAS KNOLLS:  Um, so I mean once -- obviously

16  Sergeant Alferez had us talking to the suspect trying to

17  get him to come out peacefully.  I know throughout the

18  incident I had conversations with Sergeant Alferez, um,

19  determining whether or not when we were going to deem

20  this -- or he was going to have the command post deem it

21  a barricade suspect.  Because we talked about whether or

22  not we needed to get the residents out of the adjacent

23  houses.

24      Um, so I mean, basically we were working you through

25  the progession trying to obviously talk the suspect out

36

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0833

1    of the residence and get him to come out peacefully.

2        I know that Sergeant Alferez had been in contact

3    with command post about MEU seeing if there had been any

4    contacts with MEU, um, seeing if we had any information

5    on him, the suspect with MEU.

6        And it appeared that we were, you know, working the

7    progression trying to get the suspect to come out of the

8    house

9        DETECTIVE JOHNSON:  Okay.  Did Sergeant Alferez or

10   anybody else give you any indication of when -- when the

11   SWAT -- when, you know, a barricade would be declared

12   and the SWAT team would be called?

13       NICHOLAS KNOLLS:  To my recollection -- to the best

14   of my recollection, I -- I know or I -- I believe I

15   heard at some point that whether it was Alferez had

16   talked to Sergeant Merida at the command post and

17   something was relayed that, you know, they were working

18   the progression, that they were working on calling MEU,

19   um, and then eventually we could get the SWAT.

20       DETECTIVE JOHNSON:  Okay.

21       NICHOLAS KNOLLS:  But I don't --

22       DETECTIVE JOHNSON:  Do you know if MEU -- and that's

23   the Mental Evaluation Unit, yes?

24       NICHOLAS KNOLLS:  Yes.  Mental Evaluation Unit,

25   sorry.

                                                          37

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0834

1    left with lethal.  And I was behind them calling Lopez

2    and Carlos to my side of the vehicle.

3         DETECTIVE JOHNSON:  Okay.  So around that time when

4    was the first time, when was the first point you saw the

5    suspect?

6         NICHOLAS KNOLLS:  So when I first saw the suspect

7    would have been the -- after the initial beanbag round

8    fired by Officer Gutierrez.  That caught my attention

9    and then I turned back towards the yard because

10   obviously I knew that the suspect was running towards

11   the officers.

12        Um, and at that point, like I said, when I turned

13   back to see where he was in the driveway, I could see

14   that he was by the rear window trunk of the black

15   compact car in the driveway.

16        And like I said, he was running at a full sprint.

17   And from where I was positioned and the lights, I -- it

18   appeared that he had some kind of metallic object in his

19   hand that was along his forearm that it appeared.

20        DETECTIVE JOHNSON:  So the -- the car that you're

21   describing was he on the north side or the south side of

22   that car?

23        NICHOLAS KNOLLS:  So when the suspect came from the

24   west side of the property to the south side, so he ran

25   on the north side of -- of the vehicle.  So that -- the

                                                          41

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0838

1   vehicle was parked to the -- to the south -- the

2   furthest south of the property along the brick wall.

3   And then there was probably I'd say about eight to 10

4   feet from the vehicle to the exterior of the southern

5   wall of the property.

6        DETECTIVE JOHNSON:  Okay.  So if you could place

7   him, he's on the north side of that car, can you place

8   him in relation to a fixed land mark like the corner of

9   the house or one of the windows that you described

10  earlier?  Where was he when you first saw him?

11       NICHOLAS KNOLLS:  So the black car was just south of

12  -- we're calling his -- the first window on the south

13  side of the property his bedroom.  That's what we're --

14  that's what we were calling it at the time of the

15  incident.

16       So that first window just north of the black car

17  that would have been where I first saw him.

18       DETECTIVE JOHNSON:  Okay.  And that's the window to

19  the east?

20       NICHOLAS KNOLLS:  Correct.

21       DETECTIVE JOHNSON:  Okay.  Did you hear the suspect

22  make any statements as he was moving towards the

23  officers?

24       NICHOLAS KNOLLS:  Not that I heard.

25       DETECTIVE JOHNSON:  Okay.  Now, you described seeing

                                                         42

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0839

1    a metal object, and I want to break that down into

2    finite detail.  Which hand was it in?

3           NICHOLAS KNOLLS:  When I looked back, from what I

4    first initially saw was it appeared to be in his -- his

5    left as he was running.

6           DETECTIVE JOHNSON:  Okay.  So in the suspect's left

7    hand.  Um, can you describe the object in as much detail

8    as you can for me, just a physical description of it.

9           NICHOLAS KNOLLS:  I -- like I said, it was off a

10   glare from however he was running, and the light just

11   kind of hit it.  I don't know if it was a spotlight or

12   one of the lights on the property and just appeared to

13   be like a silver metallic edged weapon is what my belief

14   was.

15          DETECTIVE JOHNSON:  Okay.  Silver metallic edged

16   weapon.  About how long was it from what you recall?

17          NICHOLAS KNOLLS:  I'd probably say about -- I mean,

18   with the -- it appeared to be the length of his forearm,

19   so I'd give that about a, you know, eight to 10 inches.

20          DETECTIVE JOHNSON:  Eight to 10 inches.  Okay.

21   Could you so the handle at all?

22          NICHOLAS KNOLLS:  No.  From what it appeared to me

23   when he was running, you know what, it -- it appeared

24   that he had it affixed in his hand or where the blade

25   was running along his forearm.  So I couldn't see the

43

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0840

1    handle but it appeared that the blade was along his

2    forearm.

3          DETECTIVE JOHNSON:   Okay.   I just want to take a

4    break here and describe for the transcriber because

5    obviously she has to write that down and she can't see

6    what you're doing now.

7          Um, Officer Knolls had his left arm up and he had

8    like a closed grip and he was motioning down along his

9    left forearm as if somebody were holding a knife with

10   the blade pointed down towards the elbow; is that -- is

11   that accurate?

12         NICHOLAS KNOLLS:   From -- from what I saw, yeah, it

13   appeared to be.

14         DETECTIVE JOHNSON:   Okay.   And how was the suspect

15   holding his hands when he was running?   Where were they

16   in relation to his body?

17         NICHOLAS KNOLLS:   His -- I mean, he was pumping his

18   arms in a full sprint towards the officers.

19         DETECTIVE JOHNSON:   Were his hands down by his side?

20   Were they up above his head?   Where -- where were they?

21         NICHOLAS KNOLLS:   Um, I want to say like torso to

22   head like running at a full sprint.

23         DETECTIVE JOHNSON:   Okay.   You indicated that you

24   heard the discharge of a beanbag round.

25         Did that beanbag round appear to have any effect

44

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER      LADA 0841

1    from what you could tell?

2        NICHOLAS KNOLLS:  It didn't appear to.  Like I said,

3    from where I acquired seeing the suspect at the back of

4    the compact vehicle and the first initial beanbag to the

5    second one, he had closed the distance pretty quickly.

6    At which point the officers fired their lethal.

7        DETECTIVE JOHNSON:  Okay.  You indicated that once

8    the suspect was down you formed an arrest team?

9        NICHOLAS KNOLLS:  Yes.

10       DETECTIVE JOHNSON:  And can you just break down the

11   job assignments of the people that were on that arrest

12   team?

13       NICHOLAS KNOLLS:  So at that point I had Officer

14   Lopez and Sabrina get some gloves on, and they were

15   going to be my arrest team.  Um, I had Officer Griffen

16   remain as lethal.

17       And like I said, there was a plant or a shrub to our

18   right which we decided to go around, walk around onto

19   the sidewalk and come from behind the suspect to

20   handcuff him.

21       DETECTIVE JOHNSON:  Okay.  After the suspect was in

22   handcuffs you indicated that you directed the officers

23   to roll him onto his right side.  Why?

24       NICHOLAS KNOLLS:  I mean obviously we wanted to make

25   sure that we were rendering aid and trying to preserve

                                                          45

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER     LADA 0842

1  time?

2      NICHOLAS KNOLLS:  Yeah.  So at that point we had

3  already been on scene for an extended period of time.

4  Um, I re -- removed my body-worn camera from my chest

5  and placed it on the rear trunk of our -- of my Explorer

6  and I used the restroom.  I went across the street and

7  found a place to use the restroom.

8      At that point I came back, affixed my body-worn

9  camera to my chest.  I mean, you can even see me go into

10  my trunk and grab my hand sanitizer out of my war bag

11  and, you know, put hand sanitizer on my hands.

12      DETECTIVE JOHNSON:  Okay.  Did you have any contact

13  with the public at all when your camera was at the shop?

14      NICHOLAS KNOLLS:  No, I did not.

15      DETECTIVE JOHNSON:  Okay.  And to the best you could

16  tell were you in public view of anybody when that

17  happened?

18      NICHOLAS KNOLLS:  No, I went tried to do it as

19  discrete as possible.

20      DETECTIVE JOHNSON:  Okay.  And then when you turned

21  your body-worn video camera off and the recording

22  stopped, when exactly did you go off?

23      NICHOLAS KNOLLS:  We went off once the suspect had

24  left in the ambulance and sarge advised us that we were

25  going to debrief.  And we went off to debrief the

                                                    47

1   incident.

2       DETECTIVE JOHNSON:  Okay.  So when you use the term

3   "debrief," um, it sounds -- when I hear "debrief" it

4   implies that there was some talking about the incident.

5   Can you tell me what if anything was debriefed about the

6   incident after your camera is off?

7       NICHOLAS KNOLLS:  No, I mean once -- once the

8   cameras were off Sergeant Alferez just made sure that

9   everybody was okay and no officers were injured, nobody

10  was hurt, made sure that everyone that was, um, either

11  involved or a primary wit remained at scene, that we

12  didn't leave his sight until sergeants were called to

13  respond and separate us.

14      DETECTIVE JOHNSON:  Okay.  So was "debrief" the

15  correct term for that because I -- was -- did you guys

16  discuss the incident or what happened or --

17      NICHOLAS KNOLLS:  I -- I -- I guess -- I guess every

18  time -- there was no -- there was no debrief of the

19  incident it was just, I guess, whenever I refer to turn

20  off the camera, it's always -- I always just say we're

21  debriefing something whether if it's with the sergeant

22  or other officers to discuss.

23      But I mean, there was no discussion of the incident.

24  It was literally we had completed the call and there was

25  no citizens around.  There was nobody in proximity to

                                                    48

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0845

1    us.  There was -- the incident was over.  We turned off

2    our cameras.  And like I said, Sergeant Alferez made

3    sure that everybody was involved remained at scene.  No

4    one was talking until the other supervisors arrived and

5    we were advised to give our public safety statements.

6            DETECTIVE JOHNSON:  Okay.  Did either of the

7    officers who used deadly force make any statements in

8    your presence about what happened?

9            NICHOLAS KNOLLS:  No.

10           DETECTIVE JOHNSON:  Okay.  Did you at some point

11   receive an order not to discuss this incident until your

12   interview by Force Investigation Division?

13           NICHOLAS KNOLLS:  Yes.

14           DETECTIVE JOHNSON:  Okay.  And when was that?

15           NICHOLAS KNOLLS:  A couple hours after the incident

16   at Foothill station.

17           DETECTIVE JOHNSON:  Okay.  And who gave you that

18   direction?

19           NICHOLAS KNOLLS:  I believe it was Detective --

20           DETECTIVE ILLIG:  Illig.

21           NICHOLAS KNOLLS:  -- Illig.

22           DETECTIVE JOHNSON:  And did you follow that

23   direction?

24           NICHOLAS KNOLLS:  Yes.

25           DETECTIVE JOHNSON:  Okay.  And did you provide a

49

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0846**

1    Public Safety Statement to anybody?

2        NICHOLAS KNOLLS:  Yes.

3        DETECTIVE JOHNSON:  Who did you provide a Public

4    Safety Statement to?

5        NICHOLAS KNOLLS:  I'm going to butcher his name but

6    it's Sergeant Morretti -- Moretti.  He was from Topanga.

7        DETECTIVE JOHNSON:  A sergeant from Topanga

8    Division?  Okay.

9        NICHOLAS KNOLLS:  I think that's how you pronounce

10   it.  I'm not sure.

11       DETECTIVE JOHNSON:  And can you just generically

12   describe that person?

13       NICHOLAS KNOLLS:  Um, male white, I want to say he's

14   in his mid forties.

15       DETECTIVE JOHNSON:  Okay.  And where was that Public

16   Safety Statement given?

17       NICHOLAS KNOLLS:  Here at Foothill station.

18       DETECTIVE JOHNSON:  At Foothill station.  Okay.  And

19   how did you get to Foothill station?

20       NICHOLAS KNOLLS:  A sergeant from Topanga drove

21   myself, Sabrina, and Officer Lopez.

22       DETECTIVE JOHNSON:  Okay.  Partner?

23       DETECTIVE ILLIG:  Yes.  While initially at the scene

24   as you were gathering information concerning all the

25   different moving parts, um, did you gather any

50

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0847

1    information concerning any weapons at the residence?

2         NICHOLAS KNOLLS:   Yeah, at one point I asked Sabrina

3    to ask the family if there were any firearms in the

4    house and they said no.

5         DETECTIVE ILLIG:   No firearms in the house?

6         NICHOLAS KNOLLS:   Not -- not that they told us.

7         DETECTIVE ILLIG:   Okay.  Now, when you were putting

8    together the team to go to the back of the house to

9    evacuate the residence in the back of the house, you

10   indicated Officer Carlos was armed with less lethal.  Do

11   you know what type of less lethal that was?

12        NICHOLAS KNOLLS:   I believe my video -- it was -- he

13   slung a beanbag.

14        DETECTIVE ILLIG:   Okay.  So independently recall or

15   is this just based reviewing the body-worn video?

16        NICHOLAS KNOLLS:   By the body-worn video.

17        DETECTIVE ILLIG:   Okay.  I don't have anything else.

18        DETECTIVE JOHNSON:   This is Detective Johnson again.

19   Two questions.

20        To your knowledge was there a crime that had been

21   committed or a crime report that had been taken in

22   relation to this incident?

23        NICHOLAS KNOLLS:   The initial call was an assault

24   with a deadly weapon.  Um, and then, um, at one point I

25   heard Officer Mendoza advising Sergeant Alferez that

51

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0848

```
 1    we -- that he had an IR investigative report signed for
 2    criminal threats.
 3          DETECTIVE JOHNSON:  Okay.  And when was that in
 4    relation to the officer-involved shooting?
 5          NICHOLAS KNOLLS:  Oh, that was -- that was during my
 6    initial response to the scene.  So that would have been
 7    in the beginning (Inaudible) what did we say the video
 8    was?  90 minutes or --
 9          DETECTIVE JOHNSON:  What classification of crime is
10    criminal threat?
11          NICHOLAS KNOLLS:  Felony.
12          DETECTIVE JOHNSON:  Okay.  And last question, I have
13    for you is, just in looking at your body-worn video and
14    where you were positioned, as the suspect was running
15    towards where you were and where the officers were, were
16    you at all concerned for your safety?
17          NICHOLAS KNOLLS:  For my safety?  No because I had
18    officers that I trusted and they had obviously jobs that
19    they were assigned to do, um, and the less lethal and we
20    had the lethal.  And obviously like I said, I put the
21    officers there that I trusted.  So I relied on them to
22    make the decision.  So I trusted them.  So I was
23    obviously in a position of cover.  So there was no need
24    for me to draw my weapon.  I had officers in position
25    that I trusted that I knew would do the right -- do the
```

52

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0849

1    right thing in the right situation.

2         DETECTIVE JOHNSON:  Okay.  Were you at all concerned

3    for anybody else's safety at that point?

4         NICHOLAS KNOLLS:  I mean, obviously as, you know, an

5    officer and a human being obviously, you know, you see a

6    suspect running with an edged weapon, of course you

7    know, I'm concerned and obviously I'm assuming that's

8    why the officers took the actions that they took.

9         DETECTIVE JOHNSON:  Could you tell just based on

10   your recollection, your observations who or where the

11   suspect was running specifically?

12        NICHOLAS KNOLLS:  I'm sorry.  Could you repeat that?

13        DETECTIVE JOHNSON:  Who was the suspect running at

14   or where was the suspect running to before the force was

15   used?

16        NICHOLAS KNOLLS:  So like I said, the way the -- the

17   scenario was set up, I mean, there was that pathway in

18   between the cars and the south -- southern wall of the

19   exterior of the house.  And then I basically just ran

20   along the -- the width of the house towards the B side

21   of the property, you know, continued towards the front

22   of our black and white towards the the gap or area that

23   I had left for officers to make their way between the

24   brick wall and the vehicle if we needed to contact

25   suspect.

                                                        53

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0850

```
 1        So I mean literally he ran from the west side to
 2    that access point on the east side of the property.  And
 3    he was running towards the officers, the only officers
 4    at scene.
 5        DETECTIVE JOHNSON:  Which officers was he running
 6    towards?
 7        NICHOLAS KNOLLS:  So there was Officer Gutierrez was
 8    positioned along the brick wall.  He was on the -- the
 9    pillar as cover.  And then Officer Grifffen was to his
10    left.  And I mean throughout the whole scenario I
11    believed in my mind Griffen was in front of me.  It
12    wasn't until we reviewed the body-worn that I actually
13    see that Officer Martinez comes into the passenger side
14    door crease, um, and is standing, um, in the crease of
15    the passenger doorway.
16        DETECTIVE JOHNSON:  Okay.  So I --
17        DETECTIVE ILLIG:  I have one question.  The metal
18    object that you described that was in the suspect's left
19    hand that you saw in the glimpse or glint or glimmer,
20    however you described it, did you ever locate that
21    object after the OIS?
22        NICHOLAS KNOLLS:  I did not.
23        DETECTIVE ILLIG:  Okay.  Did you attempt to look for
24    it?
25        NICHOLAS KNOLLS:  Yes, I looked.  Like I said, I
```

54

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER   LADA 0851

1  looked in the -- that bush or shrub that was to the
2  right of the passenger side of the vehicle and then, um,
3  I looked underneath the black and white from the
4  passenger side and then I looked underneath the vehicle
5  from the driver side.
6      DETECTIVE JOHNSON:  Did you -- were you aware of
7  anything being in the suspect's hands at the time of him
8  being handcuffed?
9      NICHOLAS KNOLLS:  No.  I -- I mean I know in the
10  video you can hear me saying that I believe he's still
11  armed.  Um, like I said, when he was down on the ground
12  he still had his hands clenched, um, and like the way I
13  described it is when I saw him running, he had his fist
14  clenched with what I saw was that metallic object along
15  his forearm.  So it was still my belief that he was
16  still holding onto it because he had it -- his hands
17  clenched like that.
18      DETECTIVE ILLIG:  Okay.
19      DETECTIVE JOHNSON:  Okay.  Sir, we're going to
20  conclude the interview.  Time now is 2257 hours.
21      ///
22      ///
23
24

                                                        55

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    LADA 0852