1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| MARIBEL MURILLO, | ) Case No. CV 22-3188-DMG (SKx) |
| Plaintiff, | ) |
| v. | ) **ORDER GRANTING IN PART AND** |
|  | ) **DENYING IN PART MOTION FOR** |
|  | ) **SUMMARY JUDGMENT [44]** |
| CITY OF LOS ANGELES, *et al.*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |
|  | ) |

In the early hours of the morning of February 1, 2022, Los Angeles Police Department ("LAPD") officers responded to calls from Decedent Jonathan Murillo-Nix's family, who stated he was armed with knives and threatening to kill them in their residence. Twenty-one officers surrounded the home.  After 78 minutes of the officers ordering Decedent to surrender,[1] he exited, armed with at least one knife, and even after the deployment of less-than-lethal force against him, rapidly approached Defendant Officers

---

[1] Officers first announced themselves and directed Decedent to exit the residence at 2:23:29 a.m. *See* Body-Worn Camera Footage ("BWC") of Jose Mendoza [Doc. # 48-1.]  Decedent exited the residence at 3:42 a.m.  [Doc. # 58-3 ¶ 25.]

1
2
Jesus Martinez and Kyle Griffin.  Believing that they saw a knife in his hand, they shot him seven times, killing him.

3
4
5
6
Maribel Murillo, Decedent's mother and successor in interest, brings suit against the City of Los Angeles, Martinez, and Griffin.  Defendants move for summary judgment on all claims against them.  [Doc. # 44.]  For the reasons discussed herein, the Court **GRANTS IN PART** and **DENIES IN PART** the MSJ.

7
# I.

8
## EVIDENTIARY OBJECTIONS[2]

9
10
11
12
13
14
15
16
With their MSJ, Defendants submitted a Statement of Uncontroverted Facts ("SUF") [Doc. # 44-1], and Murillo responded in opposition with a "Supplemental Statement of Genuine Disputes" [Doc. # 54-1], a separately numbered Supplement of Additional Material Facts ("SAF") [Doc. # 54-2], and her objections ("Pl. Obj. to SUF" [Doc. # 54-2]).  In their Reply, Defendants filed a response to Murillo's disputes with their SUF [Doc. # 58-3] and their own disputes with and evidentiary objections to Murillo's SAF.  [Doc. # 58-2; Doc. # 58-1.]

17
18
19
20
21
22
23
24
25
At the summary judgment stage, courts focus on the admissibility of the evidence's content, not its form.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  "At summary judgment, 'a party does not necessarily have to produce evidence in a form that would be admissible at trial.'"  *Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (quoting *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001)); *see also JL Bev. Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.").  In addition, "[o]bjections to evidence on the

26
27
28
---
[2] To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objections are **OVERRULED** as moot and are not separately addressed in this Order.

ground that the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself." *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 889 F. Supp. 2d 1198, 1215 (E.D. Cal. 2012); *see also Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1125 (E.D. Cal. 2016) (summarily dismissing as improper on summary judgment "nearly blanket objections to the proffered evidence . . . on the basis of relevance, hearsay, lack of foundation, lack of personal knowledge, prejudice, improper character evidence, and assuming facts not in evidence" and noting that the parties "may address evidentiary issues in pre-trial motions").  The Court therefore generally **OVERRULES** the parties' blanket objections.  To the extent Murillo argues that the "doctrine of completeness" requires the consideration of various facts, her objections are further **OVERRULED** because the Court has considered the evidence as a whole and included any evidence and portions of documents that are necessary to avoid creating a misimpression.  *See* Pl. Obj. to SUF ¶¶ 1–3 [Doc. # 54-2].

Defendants object to all of Murillo's transcripts of interviews with officers as "uncertified copies of testimony," but the case law they rely on pertains to testimony from a formal hearing, not interviews of police officers by detectives in connection with an investigation into the use of force.  *See Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir. 1962).  Defendants also raise blanket objections to reliance on the interviews, the Force Investigation Division's report, and the Board of L.A. Police Commissioner's report as subsequent remedial measures inadmissible pursuant to Fed. R. Evid. 407.  To the extent the Court has relied on any of these materials, it has not relied on any portions that amount to "measures . . . [later] taken that would have made an earlier injury or harm less likely to occur."  Fed. R. Evid. 407.  Defendants' objections to these materials being considered in connection with this Order are **OVERRULED.**

## II.

## BACKGROUND

### A.    Procedural History

Plaintiff brings the following claims:  (1) against the Officer Defendants claims of (a) infliction of excessive force in violation of the Fourth Amendment and (b) violation of substantive due process; and (2) against all Defendants claims of (a) battery, (b) negligence, and (c) violation of the Bane Act, California Civil Code § 52.1  *See generally* Complaint [Doc. # 1]; *see also* Doc. # 46 (stipulation to dismiss certain claims).

On November 3, 2023, Defendants filed the pending MSJ.  Briefing on the motion is complete (*see* Opp. [Doc. # 54]; Reply [Doc. # 58]).  The Court heard argument on the MSJ on December 15, 2023.

### B.    Summary Judgment Evidence[3]

### 1.    Overview of the Incident

The Court has reviewed the entire record but discusses only those facts that are necessary to its analysis and for context.  In this subsection, the Court provides only a brief background of the incident, as the relevant facts for this motion are those known to the Officer Defendants when they used deadly force.  *See infra* Part II(B)(2).

---

[3] The Court refers to the facts and disputes listed in the versions of the SAF and SUF filed with Defendants' Reply when citing to the SAF and SUF.  Unless otherwise stated, the material facts in this section are undisputed.  "Undisputed" facts include those that the other party identified as "disputed" but for which that party failed to cite to evidence in fact creating a dispute.  *See* L.R. 56-4.

Most of this incident was captured on multiple officers' body-worn cameras, and many of the "disputed facts" are in fact disputes over the interpretation or significance of events captured on body-worn camera footage.  Where events are clearly depicted and not subject to any reasonable dispute, the Court will cite to body-worn camera footage by timestamp, which is consistent across the videos.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (criticizing a lower court for relying on "fiction" that was clearly contrary to "the facts in the light depicted by the video tape").

On February 1, 2022 at 2:14 a.m., Decedent's brother called 9-1-1 to report that his "older brother is acting crazy" and "trying to attack my – my dad right now with knives." SUF ¶ 1. A minute later, Decedent's stepfather, Elenilson Echeverria, called 9-1-1 and requested help, stating that Decedent was intoxicated, had "knives[,] and . . . said he's trying to kill everyone here at home." SUF ¶¶ 2–4.

Officers Jose Mendoza and Isaac Ipsen arrived within five minutes and spoke with Echeverria through his bedroom window. SUF ¶¶ 5–6; *see also* Mendoza BWC at 2:19:55–2:21:50 a.m. Echeverria repeated the information from his 9-1-1 call, including that Decedent had two knives, and told officers that Decedent was in the living room and would not let the family out of their rooms. SUF ¶ 7. While officers are speaking to Echeverria, a banging sound can be heard in the footage from their body-worn cameras, and a woman yelling, "hey, hey." SUF ¶ 9; Mendoza BWC at 2:21:48–51 a.m. Officers stated, "he's gonna go in, we gotta go" and approached the home. Mendoza BWC at 2:21:49 a.m.

Officers, now including additional responding officers, entered the area at the back of the home and yelled out, directing Decedent to come out with his hands up. SUF ¶ 12. The family members were evacuated through their windows and moved away from the area. SUF ¶ 13. Decedent remained in the residence. *See* SUF ¶ 13.

Sergeant Francisco Alferez, now on scene, directed officers to hold various positions surrounding the home. *See* Alferez BWC at 2:29:36–53 a.m.; *see also* Alferez BWC at 2:36:48 a.m. ("we have the whole area surrounded"). Police positions and weapons included six officers, armed with a 40 mm launcher, a Taser, three pistols, and a shotgun behind a wall to the west; two officers, armed with a 40 mm launcher and a pistol, to the east; and four officers, armed with three pistols and a beanbag shotgun to the southwest, on the sidewalk. In the curtain of the driveway, a patrol vehicle was parked, with nine officers, armed with a beanbag shotgun, six pistols, a shotgun, and a ballistic shield, around it. SAF ¶ 49. By the time of the shooting, Decedent and the officers were the only ones around the house; no third parties were present, and Decedent was alone in the residence.

SUF ¶ 13. A mental evaluation unit ("MEU") was *en route* but did not arrive before the shooting. SAF ¶ 54.

Officers gave commands to Decedent over the 78-minute period beginning at 2:23 a.m. *See* SAF ¶ 46. The parties dispute whether Decedent heard any of these communications and whether officers giving orders "negotiated" with Decedent or "threatened" him. *See* SUF ¶ 23, SAF ¶ 56. Although whether Decedent heard all of the commands is not an issue susceptible to proof, the Court has the benefit of listening to the audio from various officers' body-worn camera footage. Police repeatedly commanded Decedent to exit the home, unarmed, and told him that if he did so he would not be hurt, primarily using the loudspeaker of the patrol car parked in the driveway. *See* Alferez BWC at 2:36:08 a.m. Officers can also be heard using the loudspeaker to warn Decedent that if he exited the residence with a weapon and was a threat against officers, force would be used against him and he would be hurt or killed. Alferez BWC at 2:47:20 a.m; *see also* Alferez BWC at 2:48:15 (warning that less lethal or deadly force would be used if Decedent exited with a weapon). Later, Defendant Martinez also used the loudspeaker to communicate that "SWAT's coming, they're gonna go in there and get you. I don't want you to get hurt" (Alferez BWC at 3:32:46 a.m.); "they're gonna use gas and use anything they can to get you out" (*Id.* at 3:33:04 a.m.); and "they're gonna use gas and they're gonna use force." *Id.* at 3:33:37 a.m. Decedent communicated back with officers during certain portions of the exchange, indicating that he was able to hear at least some of the commands. *See, e.g.*, Barba BWC at 2:58:14–18 a.m. [Doc. # 48-1 at 14.]

At 3:42 a.m., Decedent exited the back of the house. SUF ¶ 25. An announcement over the radio stated that Decedent had exited the residence with "two knives" in his hand.[4]

---

[4] Murillo disputes whether Decedent held any knives at any time after he exited the residence, a point of disagreement between the parties that will be addressed in greater detail *infra*. *See* SUF ¶ 25. It is not reasonably subject to dispute, however, that officers made this announcement, which can clearly be heard in the body-worn camera footage.

SUF ¶ 27; Barba BWC at 3:42:27 a.m.  An officer at the back called out to Decedent that they were not trying to hurt him, but that they were not going anywhere, either.  SUF ¶ 27; Officer Schlesinger BWC at 3:42:34 a.m [Doc. # 48-1 at 33].  Defendant Martinez also used the loudspeaker to direct Decedent to go back inside the house, to the window, saying, "we don't want you to get hurt."  Barba BWC at 3:42:30–34 a.m.

At 3:42:35 a.m., seeing Decedent run toward the front of the house, Officer Schlesinger fired his 40 mm less-lethal weapon at Decedent.[5]  SAF ¶ 60; Schlesinger BWC.  Decedent fell to the ground.  SAF ¶ 63.  He then got up and ran away from the direction of the 40 mm shot and toward the front of the house.  SAF ¶ 64.  At 3:42:37 a.m., an officer announced over the radio that Decedent was "going towards the front."  Barba BWC.  Defendants Martinez and Griffin knew that Decedent was out of the house and coming to the front.  SAF ¶ 65.

At 3:42:43 a.m., Decedent came around to the front of the house and Gutierrez shot Decedent with his beanbag shotgun, three times, striking him.  SAF ¶¶ 66, 72.  Gutierrez told detectives investigating the use of force that he believed he saw a knife in Decedent's right hand when he fired the first round, Decedent then sprinted at the officers, and Gutierrez fired his beanbag shotgun twice more.  SAF ¶ 66; *see also* Doc. # 57-12 at 8.  Gutierrez thought that Decedent dropped the knife when he fired the third round because he heard a metallic "clink."  [Doc. # 57-12 at 20.]  Even after the beanbag shots, body-

---

[5] Officer Schlesinger's body-worn camera footage does not show Decedent's movements.  *See* SUF ¶ 28; Schlesinger BWC at 3:41:13–3:42:40 a.m.  Schlesinger told investigators that he saw Decedent start running toward the front of the house, which caused him to shoot Decedent with the 40 mm weapon.  Although Murillo disputes this fact, she points to no evidence creating a factual issue.  The fact therefore is uncontroverted for purposes of this motion.  SUF ¶ 28; Doc. # 57-7 at 6–7; Doc. # 54-22 at 4–5 (Clark Report).

There is also a disputed issue as to whether Officer Tykhomryov fired his 40 mm less-lethal weapon at Decedent after Schlesinger fired.  *See* SUF ¶ 30; *compare* Tykhomryov BWC at 3:41:41 [Doc. # 48-1 at 37], *with* Tykhomryov Statement at 9 [Doc. # 57-9].  The Court will take as true for purposes of the motion that Tykhomryov did not fire, as Murillo argues.

worn camera footage clearly depicts Decedent continuing to move rapidly toward the officers. *See* Griffin BWC at 3:42:45 a.m.

Nearly instantaneously with but slightly after the final beanbag shotgun round, seven gunshots were fired by the Officer Defendants: four by Griffin, who fired the first shot, and three by Martinez, who fired the last shot. SAF ¶¶ 82, 84, 89, 96. Their shots killed Decedent, whose resting position was on his back, with his head toward the officers. *See* Griffin BWC at 3:42:46 a.m. [Doc. # 48-1 at 26].

### 2.    Evidence Regarding Officer Defendants' Perspectives

Defendants Griffin and Martinez arrived on scene at 2:32 a.m. *See* Griffin BWC; Martinez BWC [Doc. # 48-1 at 28.] Griffin later stated that he knew Decedent had made criminal threats against the family, based on the reports of officers who arrived on scene before him. [Doc. # 57-2 at 5.] Martinez similarly later stated that he remembered the call as involving someone being "combative and aggressive towards family. And possibly knives involved." [Doc. # 57-4 at 9; *see also* Doc. # 54-6 at 25.]

Armed with a pistol, Griffin took his position in the driveway near the passenger door of the patrol car. The car had its front lights and spotlight on, illuminating the driveway area. *See* Griffin BWC at 2:32–35 a.m. Martinez positioned himself initially near Officer Gutierrez, on the fence to the right of the patrol car (*see* Martinez BWC at 2:36 a.m.), then in the patrol car at 2:52 a.m., when he took over giving commands to Decedent. *Id.* At the time of the shooting, he was near the passenger door of the patrol car.[6] *See id.* at 3:42 a.m. Both officers were generally present as commands were given to Decedent using the patrol car loudspeaker.

---

[6] Martinez stated that another officer took over the communications with Decedent, when Martinez felt his attempts were not "getting through to" Decedent, but Martinez ran back to the microphone to attempt to communicate with Decedent again when Decedent exited the home. [Doc. # 57-4 at 12–13, 25.]

Martinez later stated that from his vantage point, he could hear Decedent throwing things inside the home and that when he tried to communicate with Decedent, Decedent sounded "aggressive and possibly under the influence[.]" [Doc. # 57-4 at 12, 37.] Griffin similarly told investigators that although he could not hear everything Decedent said all the time, "he was yelling and it was . . . in an aggressive manner," and Griffin could hear "him hitting things on the inside." [Doc. # 57-2 at 5, 8.] Martinez heard Decedent bring up killing and making comments that sounded like "rambling" and "weren't making sense," although he "couldn't really hear" everything Decedent said. [Doc.# 57-4 at 20–22, 25, 34, 38.] Martinez believed that a SWAT team was on the way. [Doc. # 57-4 at 23.]

Regarding the Officer Defendants' use of deadly force, Griffin's, Martinez's, and Gutierrez's body-worn camera footage, which give the clearest view, depict the following: Gutierrez fired his bean bag launcher three times, at 3:42:42 a.m., 3:42:43–44 a.m., and 3:42:44–45 a.m. *See* Gutierrez BWC. At the firing of the final beanbag round, Decedent was clearly still on his feet and moving in the direction of the officers, although his body had begun to fold. [7] *See* Griffin BWC at 3:42:45 a.m. A volley of shots was fired within two seconds, with Decedent falling to the ground. *Id.* at 3:42:45–46. It is undisputed that Griffin fired the first of the seven shots and Martinez fired the last of the seven shots, but neither party is otherwise able to link shots fired to a particular shooter. SAF ¶¶ 82, 88; *see also* Reply at 15 n.1.

In his initial interview, Griffin stated that he perceived the following sequence of events: he heard a less-than-lethal weapon firing and a broadcast that Decedent was going to the front of the house; he saw Decedent moving toward his direction, between the house

---

[7] Murillo argues that a reasonable juror could find that Decedent did not run toward the officers, but was running along the side of the residence, then turned toward the only egress from the property, where they were located, and was blinded by the spotlight. SUF ¶ 31. In the Court's view, this is not a material dispute, as the body-worn camera footage clearly depicts Decedent quickly approaching the Officer Defendants when they open fire. *See* Martinez BWC at 3:42:45; *see also Scott*, 550 U.S. at 380–81.

1   and parked cars; he heard Gutierrez fire his beanbag rounds; and he saw Decedent (who
2   came into view from the other side of the parked car) running at a full sprint toward him,
3   carrying a large metallic object in one hand, which looked like a knife pointed in Defendant
4   Griffin's direction. [Doc. # 57-1 at 9–10, 13.] At this point, according to Griffin, Decedent
5   was approximately 15 feet away and had gone from running along the property to running
6   toward Defendant Griffin. *Id.* at 10, 14. Decedent was moving toward Griffin during each
7   shot he fired, although he was leaning down more toward the final shots. *Id.* at 17–19. He
8   fell within five feet of Griffin, although Griffin also backed away while firing. *Id.* at 20–
9   21. At his second interview, Defendant Griffin stated that he believed the knife was in
10  Decedent's right hand. [Doc. # 57-2 at 28.] When deposed, Griffin stated that he stopped
11  firing because Decedent was "slowing down." *Id.* at 35.

12          Martinez described the following sequence of events in his initial interview with
13  detectives: he heard Officer Schlesinger fire the 40 mm round; he heard Officer Gutierrez
14  fire the beanbag launcher; he first saw Decedent when Decedent crossed in front of a
15  spotlight, clearly bearing a knife in his hand and running toward Defendant Griffin and
16  Officer Gutierrez; Martinez fired two shots; Decedent fell; and Martinez fired again. [Doc.
17  # 57-3 at 8–9.] Martinez's explanation regarding the third shot differed, however, in his
18  second interview: he stated that he fired the third shot because Decedent was still
19  advancing toward him and "lunged forward." [Doc. # 57-4 at 45, 47.] Similarly, in his
20  deposition testimony, Martinez denied shooting Decedent when he was on the ground,
21  stating that during the first round, Decedent was upright; during the second round,
22  Decedent was upright hunched over slightly; and during the third round, Decedent was
23  "hunched over more closer [*sic*] to the ground lunging toward me." [Doc. # 54-6 at 21–
24  22.] Martinez also stated during his deposition that he at first was behind the patrol car's
25  open passenger door, then he retreated backward about a foot or so, and Decedent's
26  movement past the door closed it. [Doc. # 54-6 at 45, 68.]

27

28

### 3. Evidence Regarding the Purple Knife

It is undisputed that no knife was recovered from or in the immediate vicinity of Decedent's body.  Two knives were, however, recovered from the scene.  SUF ¶ 26.

Pertinent to this motion, the blade of one of these knives was found approximately 10 feet from where Decedent was standing when Griffin first shot him.  SUF ¶ 38. Defendants rely on the report of criminalist Tracy Ng, who states that she recovered a four-inch long knife and fragments of purple plastic from the site of the incident.  [Doc. # 44-4 at 2.]  She opines that the damage to the handle is consistent with a bullet striking it.  *Id.* Defendants also rely on the report of criminalist Kari Mar, who states that DNA recovered from the handle is likely Decedent's. [Doc. # 44-5 at 2.]  It is undisputed that a gunshot struck Decedent's back right hand.  SAF ¶ 105.

### III.

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v.*

*City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## IV.

### DISCUSSION

**A.   Fourth Amendment:  Decision to Begin Firing**

**1.   Immediacy of the Threat**

Defendants move for summary judgment as to all claims.  The Court begins by addressing Murillo's Fourth Amendment claim, which is brought against the Officer Defendants.  The parties dispute whether the Officers' use of deadly force was reasonable under the standard articulated in *Graham v. Connor*, 490 U.S. 386 (1989).

The starting point is the immediacy of the threat posed by Decedent.  *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 994 (9th Cir. 2014) ("The immediacy of the threat posed by the suspect is the most important [*Graham*] factor.").  As with all *Graham* factors, this factor must be considered from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.  *Graham*, 490 U.S. at 396.

A key dispute concerns whether a reasonable jury would necessarily credit the Officer Defendants' claims that they observed a knife in Decedent's hand as he quickly approached them, when viewing the facts in the light most favorable to Murillo.  Both Officer Defendants stated repeatedly that they had seen Decedent armed with a knife immediately before they opened fire and that they perceived themselves to be in immediate danger.  [*See* Doc. # 54-5 at 22, 36, 44–46 (Griffin's deposition testimony that he saw the knife for the initial shots); Doc. # 57-1 at 10, 20–21 (similar); Doc. # 57-2 at 28, 30 (similar); Doc. # 54-6 at 32–33 (Martinez's deposition testimony that he saw the knife in

-12-

Decedent's right hand when he crossed in front of the spotlight; Doc. # 57-3 at 9 (similar); Doc. # 57-4 at 14 (similar).]

Murillo argues that a reasonable juror could find that Decedent was unarmed, pointing to evidence that no knife was found in his hand or within the immediate proximity of his body and that several officers did not see—and no body-worn camera footage clearly depicts—a knife in his hand.[8]  Nor does the body worn camera footage resolve this issue, as most officers' footage does not clearly depict Decedent's body during the incident and in the footage that does, Decedent's hands cannot clearly be seen.

 Murillo's argument fails, however, in light of the evidence that the knife was shot from Decedent's hand.  A criminalist states that the four-inch long, purple-handled knife blade was found approximately 10 feet from where Decedent was positioned when Defendant Griffin first shot him and opines that the damage to the handle is consistent with being shot by a bullet.  *See* Doc. # 44-4 at 2; SUF ¶ 38.  It is undisputed that Decedent was shot in the hand by one of the Officer Defendants.

Murillo has failed to submit evidence that would cause a rational trier of fact to question Defendants' version of the events and thus has failed to create a factual dispute requiring resolution by a jury.  *See supra* Part II(B)(3); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." (internal citations omitted)).

There is also undisputed evidence that Decedent's prior threatening behavior was known to the Officer Defendants.  As noted above, Griffin and Martinez later stated they

---

[8] Officers Alferez, Frazer, Tykhomyrov, and Carlos did not see a knife in Decedent's hand from their vantage points.  [*See* Doc. # 57-5 at 28, 34 (Alferez); Doc. # 57-8 at 6, 9 (Frazer); Doc. # 57-9 at 12 (Tykhomyrov); Doc. # 57-10 at 9 (Carlos).  *But see* Doc. # 57-12 at 19 (Gutierrez's statement that he saw a knife in Decedent's hand when he fired the first two beanbag shotgun rounds); Doc. # 57-11 at 5 (Carlos' statement that he saw an object in Decedent's hand).]

knew about Decedent making criminal threats against or being combative and aggressive toward family, with knives involved.   [Doc. # 57-2 at 5; Doc. # 57-4 at 9; *see also* Doc. # 54-6 at 25.]   In both Defendants' body-worn camera footage, Decedent can be heard threatening the police, yelling, "I'm going to kill all of you, dumbasses" at 2:37:49 a.m. and "you're gonna be dead next, and by 'you' I mean all of you, you stupid fucks" at 3:08:25 a.m.[9]   He alluded to himself dying "to help [his] family" at 3:35:10 a.m.—a statement that Defendant Griffin later recounted hearing.   [Doc. # 47-2 at 11.]   Defendant Martinez stated that he heard Decedent making statements that he wanted to hurt people and officers.[10]   [Doc. # 54-6 at 59.]

Finally, while Murillo argues that the final beanbag shot effectively stopped Decedent, the body-worn camera footage clearly shows Decedent still on his feet and approaching the officers at a rapid clip at the time they opened fire.   Griffin BWC at 3:43:45 a.m.

In short, the first *Graham* factor weighs in favor of Defendants as to the decision to open fire, because there is no genuine factual dispute that when the first shot was fired, the Officer Defendants perceived themselves to be in mortal danger by a knife-wielding, quickly approaching assailant who had made threats of harm and was within close proximity of them.

_____

[9] Murillo disputes whether Griffin or Martinez heard these threats, but the evidence she cites does not create a genuine dispute.   [*See* Doc. # 54-5 (Griffin did not hear threats *once Decedent was outside*); Doc. # 54-6 (Martinez heard Decedent shout remarks out the window but he did not say anything *as he was approaching the officers*).]

[10] Further, at 2:48:08 a.m., an officer can clearly be heard telling Decedent not to throw anything else out of the window.   Griffin BWC; *see also* Doc. # 57-4 at 38 (Martinez telling investigators that at some point, he heard "someone sa[y] something came out of the house."); Doc. # 57-2 at 7 (Griffin saw Decedent throw something from the window).   Murillo argues that at least one other officer did not see anything thrown out of the window, but this does not create a genuine issue of material fact as to whether other officers, from different vantage points, saw this and told the officers around them, including Defendant Martinez.   *See* SAF ¶ 23 (citing Doc. # 57-5 at 48).

### 2.    Seriousness of the Crime and Resistance or Attempts to Flee

"The severity of the crime at issue" and whether Decedent was actively resisting or attempting to evade arrest also weigh in favor of Defendants.  *See Graham*, 490 U.S. at 396.  As to the severity of the crime, as noted above, Decedent had threatened to kill his family, who were evacuated from the home.  Although the Officer Defendants arrived on scene after the family was evacuated, they were aware that the crime involved felonious threats against his family (Griffin [Doc. # 57-2 at 5] or threatening family members with knives (Martinez [Doc. # 57-2 at 5]).  Given the violent and aggressive nature of the incident that led police to respond and Decedent's continued aggression and threats during the ensuing barricade of the home, there is no reasonable dispute that this factor weighs in favor Defendants as to the initial use of force.

Murillo argues that this was not a serious or violent crime in progress because Decedent did not harm any person, did not attempt to strike any officer, and believed he was protecting his family and that Decedent was falling, not attempting to flee.  Opp. at 16.  Although it is undisputed that Decedent did not harm any person during the incident, it is clear from the 9-1-1 calls that his family feared for their safety and had barricaded themselves in rooms away from Decedent.  [*See* Doc. # 48-1 at 1–8.]  As discussed extensively above, there is no jury question as to the reasonableness of the Officer Defendants' fear for themselves and that they perceived Decedent running toward them, still upright, with a knife when they fired the first six shots.  Murillo's arguments about Decedent stating he was dying "to protect" his family misstate his words and do not create a factual issue as to the reasonableness of Officer Defendants' perception that this statement was a threat to officers and an indication that Decedent did not intend to end the encounter peacefully.

### 3.    Availability of Less Intrusive Alternatives

Murillo argues that Defendants failed to consider the use of lesser alternatives, such as less-than-lethal force or verbal warnings.  Opp. at 16–17 (citing *Davis v. City of Las*

*Vegas*, 478 F.3d 1048, 1054 (9th Cir 2007)).  This argument merits little discussion, as there can be no genuine dispute that over the 78-minute long period before using force, officers entreated Decedent to leave the home and warned him that less-than-lethal or deadly force would be used upon him if he did not comply.  It further is not reasonable for Murillo to claim that the evidence shows a failure to attempt lesser force, as Officer Schlesinger deployed his 40 mm projectile weapon first, before any other use of force, and this did not stop Decedent from running to the front of the residence with a knife.   Nor were Officer Gutierrez's initial beanbag rounds successful at halting Decedent.  This factor, too, weighs in Defendants' favor.

### 4.    Suffering a Mental Health Crisis

Murillo additionally argues that the Court should consider that Decedent was suffering a mental health crisis.  Opp. at 17.  She cites the principle that "even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the government interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual."  *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001).

Viewing the evidence in the light most favorable to Murillo, a trier of fact could conclude that the information known to the Officer Defendants, such as their own perceptions of Decedent's bizarre and incoherent behavior, led them to believe that Decedent could be suffering a mental health crisis.  This factor weighs in favor of Murillo and against the Government's interest in the use of force.

Nevertheless, even if a person appears to be suffering a mental health crisis, officers may use deadly force against that person without violating the Fourth Amendment when they face an immediate threat of death or serious harm.  *See City & Cnty. of S.F. v. Sheehan*, 575 U.S. 612–13 (2015) (the use of deadly force on a mentally disturbed woman advancing on an officer with a knife did not violate the Fourth Amendment); *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (the use of deadly force against a suicidal person who

advanced on officers with a rock over his head was not unconstitutional); *Han v. City of Folsom*, 551 Fed. App'x 923, 925 (9th Cir. 2014) (the use of deadly force on a person who had been acting mentally unstable and approached officers while holding a knife was not objectively unreasonable).  It is well-established that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005).

Murillo cites to *Vos v. City of Newport Beach*, in which it was unreasonable to use deadly force against an agitated, potentially mentally unstable or intoxicated person who had isolated himself in a convenience store with multiple officers in front.  The person then ran toward officers, carrying scissors, from a distance of 30 feet, and the officers deployed deadly force.  892 F.3d at 1028–30.  There are several material differences between *Vos* and the circumstances here:  most importantly, unlike in *Vos*, where officers had the option of using less-than-lethal force but did not, such a lower level of force was used against Decedent to no avail.  Further, Vos had not previously harmed or endangered others and was in a public place, whereas Decedent was in the family home and had made grave threats against both his family and officers.

Murillo's reliance on *Glenn v. Washington County* is similarly unavailing.  Glenn, had damaged household property and threatened to kill himself, was holding a pocketknife to his own neck, and did not comply with police commands.  He was shot with beanbag rounds and retreated away from the rounds, toward the family home—leading to a near instantaneous police shooting.  *See* 673 F.3d 864, 879 (9th Cir. 2011).  Decedent's violent, threatening behavior and charging *toward* officers while armed distinguishes this case from *Glenn*, as well as the fact that Schlesinger's unsuccessful use of less-than-lethal force occurred well before Decedent rounded the corner and approached the driveway.

The Court is also unpersuaded by Murillo's citation to *S.B. v. County of San Diego*, in which the decedent had been acting aggressively and threatening his family at home, causing them to flee.  There, a jury could have concluded that the force used was

unreasonable because the decedent had been shot while he was on his knees six to eight feet away from officers, less-than-lethal force was available but not used, and an officer shot as soon as the decedent's hand touched the knife.  864 F.3d 1010, 1014 (9th Cir. 2017).  This case poses a different situation where Decedent was indisputably quickly charging officers while armed with a knife and for whom prior warnings and the deployment of less-than-lethal force had been unsuccessful.

**B.   Fourth Amendment:  Subsequent Shots**

As noted, the Officer Defendants fired a total of seven shots within two seconds.  Griffin's initial gunshot, fired at 3:42:45 a.m., triggered a volley of five shots, fired nearly simultaneously, as Decedent fell to the ground.  Martinez then fired the final shot.

Even if initial shots are justified under the Fourth Amendment, subsequent deadly force is unconstitutional if the subject no longer poses an immediate threat.  As the Ninth Circuit held in *Zion v. County of Orange*,

> terminating a threat doesn't necessarily mean terminating the suspect.  If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting. . . .  This is particularly true when the suspect wields a knife rather than a firearm.

874 F.3d 1072, 1076 (9th Cir. 2017).  While there is no requirement that an officer must "reevaluate whether the deadly threat has been eliminated after each shot," the officer may no longer shoot after the threat has been eliminated.  *See Wilkinson v. Torres*, 610 F.3d 546, 552 (9th Cir. 2010); *accord Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended").

There is no discernable pause in the volley of shots through the penultimate shot fired—indeed, two of the five shots were fired simultaneously, so that the shots are indistinguishable on the recordings.  Having viewed the body worn camera footage, the Court can find no reason to treat the first six shots as more than one event for the purpose

of the Fourth Amendment analysis.  *See Hopkins v. Andaya*, 958 F.2d 881, 886 (9th Cir. 1992) (separately analyzing uses of deadly force where there was a break between them and the exigency of the situation had lessened dramatically), *overruled on other grounds by Saucier v. Katz*, 533 U.S. 194, 200–01 (2001); *see also Earl v. Campbell*, 859 Fed. App'x 73, 75 (9th Cir. 2021) (distinguishing between cases involving a series of shots fired without pause and cases where an officer shoots, pauses, and shoots again, having time to assess whether the threat subsided).

Even though there are factual issues as to when,[11] precisely, Decedent was disarmed, these issues are not material as to the first six rounds fired.  [*See* Doc. # 57-1 at 21; Doc. # 57-2 at 30; Doc. # 54-5 at 56 (Griffin's statements that he lost sight of the knife after the second shot); Doc. # 57-3 at 9, 21 (Martinez's initial statement that he fired two shots when he saw the knife but that he could not see Decedent's hands when he fired the third shot); Doc. # 57-12 at 19 (Gutierrez's statement that he could no longer see the knife when he fired the third beanbag round).]  Having perceived the imminent use of deadly force against them, the officers were allowed to fire until they could see that the threat had ended.

## C.   Fourth Amendment:  Martinez's Final Shot

Martinez fired the final shot after a brief pause—no more than one second.  In his initial interview with detectives, he stated that after firing the first two shots, Decedent fell, and Martinez backed away, repositioned himself, and fired again, fearing that Decedent would get up again because Decedent appeared to be going toward his stomach.  [Doc. # 57-3 at 9, 20.]  He later acknowledged at his deposition that his prior statement did not reflect the events shown on the video footage and stated that when he fired the third round, Decedent "was hunched over more closer [*sic*] to the ground lunging towards me."  [Doc.

---

[11] Defendants have filed a screenshot from Gutierrez's body worn camera footage, at 3:42:45 a.m., when the first shot was fired, that they claim shows the knife pinwheeling through the air, having been projected from Decedent's hand.  [Doc. # 48-1 at 42.]  A reasonable jury could disagree, as the screenshot merely depicts a gray spot that is not necessarily discernible as a knife blade.

# 54-6 at 22, 38–39.]  Regarding the final shot, Martinez's initial interview statement is inconsistent with his deposition testimony—and both versions are at odds with the video footage.  This gives rise to a triable issue of fact.

Having reviewed the video footage carefully, the Court finds that a reasonable jury could find not only that the threat had ended, but that Martinez could and did pause, albeit very briefly, to reassess the situation before firing the final shot after Decedent had already fallen to the ground.  Under the authority set forth above and viewing the evidence in the light most favorable to Murillo, this version of events would violate Decedent's Fourth Amendment rights.  The Court accordingly finds a triable issue of fact solely with regard to Martinez's final shot.

In support of their argument that Martinez's final shot could not have violated the Constitution, Defendants cite to a number of district court rulings, which are, of course, not binding on this Court.  *See* Reply at 16.  Nor are those rulings persuasive, as the circumstances in those cases are not analogous to the evidence giving rise to triable issues of fact here—*i.e.*, where viewing the evidence in the light most favorable to Plaintiff, the officer had time to pause and see that the suspect was prone and no longer a threat of imminent harm, then chose to deploy deadly force anyway.  *Cf. J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 987 (E.D. Cal. 2011); *Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1157–58 (E.D. Cal. 2005); *Estate v. Adomako v. City of Fremont*, No. 17-CV-06386-DMR, 2019 WL 2568835, at *7 (N.D. Cal. June 21, 2019); *see also Est. of Hernandez v. City of Los Angeles*, No. 2:20-CV-04477-SB (KSx), 2021 WL 4139157, at *5 (C.D. Cal. Aug. 10, 2021) ("While Plaintiffs contend that Decedent no longer posed a risk after the initial round of shots was fired, that is plainly contradicted by the video evidence.  After the first volley, Decedent, still holding the knife, quickly pops back up and appears positioned to charge at Officer McBride.  After the second volley, Decedent hits the ground, and still holding the knife, rolls over from his back and still appears to try to get up—or, at least, it cannot be said that the threat had ended.").

-20-

Neither does qualified immunity shield Martinez from liability.  The Ninth Circuit has held that shooting an unarmed suspect who no longer poses an immediate threat is an "obvious" case in which qualified immunity does not apply.  *See Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (discussing pre-2022 precedents); *see also Zion*, 874 F.3d at 1076 (holding that the law was clearly established that it was unconstitutional to use deadly force against a suspect who no longer posed an immediate threat and who had been brought to the ground by the first volley of shots).

### D.   Remaining Claims

#### 1.   Substantive Due Process

The Court turns next to Murillo's claims for violation of substantive due process against the Officer Defendants.

"Children have a Fourteenth Amendment liberty interest in the companionship and society of their parents, and vice versa." *Wilkinson*, 610 F.3d at 554.  Official conduct that "shocks the conscience" in depriving children of that interest in their family relationships is cognizable as a violation of due process.  *Id.*; *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

In determining whether an officer's force shocks the conscience, the court first asks whether the circumstances of the case allowed the officer to have actual deliberation. *Wilkinson*, 610 F.3d at 554.  Deliberation is impractical when a suspect's evasive actions force the officers to act quickly or when fast-paced situations pose safety concerns. *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014).  In such fast-paced situations, the Court applies the purpose-to-harm standard, under which a plaintiff must show that the officer's goal was to cause harm unrelated to a legitimate law enforcement objective.  *Porter*, 546 F.3d at 1140.  Under this standard, for the reasons discussed in more detail above, the Court finds no genuine dispute of material fact that all shots fired were related to a legitimate law enforcement objective and **GRANTS** summary judgment as to this claim.

### 2.   Battery Claim

Murillo brings claims for battery against all Defendants.

California law defines battery as "any willful and unlawful use of force or violence upon the person of another."  Cal. Penal Code § 242.  Claims for battery against police officers acting in their official capacities "are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution."  *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012).  Accordingly, the Court **GRANTS** the MSJ as to the battery claim against all Defendants relating to the first six shots, but **DENIES** the MSJ as to the City's and Martinez's potential liability for the final shot, fired by Martinez.

### 3.   Bane Act Claim

Murillo brings claims for violation of the Bane Act against all Defendants.

California Civil Code section 52.1, known as the Bane Act, creates a cause of action against those who interfere with constitutional rights "by threat, intimidation, or coercion." In an excessive force case, the Bane Act requires not merely that the plaintiff establish a Fourth Amendment violation, but also "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. Cnty of Sacramento*, 888 F.3d 1030, 1043 (2018).  A plaintiff must prove that the offending officer "intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (internal quotation marks omitted).

For substantially the same reasons that Murillo cannot show that first six shots amounted to an unreasonable use of deadly force, Murillo cannot show that the first six shots violated the Bane Act.  There is a triable issue of fact, however, as to whether Martinez fired the final shot with a specific intent to violate Decedent's right to freedom from unreasonable seizure.  As such, the Court **GRANTS** the MSJ in favor of all Defendant Officers and the City as to the first six shots, but **DENIES** the MSJ as to the City's and Martinez's potential liability for the final shot.

### 4.   Negligence

Murillo brings negligence claims against all Defendants.

"In order to establish negligence under California law, a plaintiff must show that the defendant had a legal duty to use due care, that the defendant breached that duty, and that the breach was a legal or proximate cause of plaintiff's injury." *USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1412 (9th Cir. 1994). "California negligence law regarding the use of deadly force overall is broader than federal Fourth Amendment law." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021). Officers can be liable "if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.* Under California law, a deputy's "duty to act reasonably when using deadly force applies to [his] pre-shooting conduct." *Hayes v. Cnty. of S.D.*, 736 F.3d 1223, 1235 (9th Cir. 2013).

Murillo argues that Defendants are liable not only based on their use of force but because they failed to have an adequate tactical plan, failed to properly communicate with Decedent and other officers, failed to provide a verbal warning, failed to de-escalate the situation, failed to utilize mental health services, and failed to attempt less intrusive alternatives. Opp. at 26.

With regard to the negligence claim against Defendant Griffin, not only was his use of deadly force reasonable under the Fourth Amendment, but there is no evidence to support that he played a role in the events leading up to the use of deadly force. [*See generally* Doc. # 57-2 (Griffin's interview with investigators describing his role in the incident).] There are triable issues of fact, however, as to the reasonableness of Defendant Martinez's use of force for the final shot fired, as discussed in this Order.

Murillo further argues that Martinez is liable because his negligent actions leading up to the shooting caused him to need to use deadly force. *See* Complaint ¶ 101. As shown in his body-worn camera footage, Martinez was the primary person who communicated with Decedent and warned Decedent that SWAT would forcibly remove him from the

residence.  A rational trier of fact could find not only that this escalated the situation and precipitated Decedent's exit from the home after a 78-minute wait, but that such an escalation was unreasonable given evidence of Decedent's mental health crisis.  Viewing the evidence in the light most favorable to Plaintiff, Decedent's immediate removal from the home was unnecessary:  MEU was on the way, no one else was in danger inside the house, and many officers surrounded the home.  A jury could reasonably conclude, under the broader negligence standard, that Martinez's negligence led to the escalation of the situation and the need for the officers to use deadly force at all.[12]  *See Hayes v. Cnty. of S.D.*, 57 Cal. 4th 622, 630 (2013) ("[P]reshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable.").

The Court **GRANTS** the MSJ as to the negligence claim against Griffin, but **DENIES** it as to the City and Martinez.

### 5.    Punitive Damages

Murillo seeks punitive damages against the Officer Defendants.[13]  Because there is a triable issue of fact as to whether Martinez fired the final shot with malice, oppression, or reckless disregard of Decedent's rights, the Court **GRANTS** the MSJ as to the claim for punitive damages as to Griffin, but **DENIES** Defendants' MSJ inasmuch as it seeks dismissal of the request for punitive damages on the remaining claims against Defendant Martinez.  *See* MSJ at 28–29.

---

[12] To the extent Martinez argues he is entitled to immunity under Cal. Gov't Code § 820.2, providing for discretionary immunity for government employees, even if the Court assumes without deciding that Martinez's use of force was a protected "discretionary" decision, this immunity does not apply to officers who use unreasonable force in making an arrest.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 468 (9th Cir. 2007); *see also Conway v. Cnty. of Tuloumne*, 213 Cal. App. 4th 1005, 1015 (2014) (explaining that while discretionary immunity applies to many areas of police work, it does not apply to the use of unreasonable force in effecting an arrest).

[13] Murillo does not seek punitive damages against the City.  *See* Complaint at 24 [Doc. # 1].

## V.

## CONCLUSION

The MSJ is **GRANTED IN PART and DENIED IN PART**.  The following claims survive:   claims against Defendant Martinez for violating the Fourth Amendment and claims against Defendants Martinez and the City of Los Angeles for battery, negligence, and violation of the Bane Act.  The Court grants summary judgment in favor of Defendant Griffin.

**IT IS SO ORDERED.**

DATED:  December 20, 2023

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE